IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MELVIN L. BROWN,

    Petitioner,                                 No. CIV S-06-2360 LKK CHS P

    vs.

RICH SUBIA, acting warden,

    Respondent.              FINDINGS AND RECOMMENDATIONS

_____/

## I. INTRODUCTION

Petitioner Melvin L. Brown is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner was convicted by jury of first degree murder in the San Joaquin County Superior Court, case SF83625A, and was sentenced to a prison term of 25 years to life. Petitioner has presented three grounds for relief, reorganized for clarity into the following three claims: (A) there was insufficient evidence to support the first degree murder conviction; (B) the conviction should be set aside based on newly discovered evidence; and (C) trial counsel rendered ineffective assistance. For the reasons that follow, the claims are without merit and the petition must be denied.

/////

/////

1

## II. BACKGROUND

The following background summary was set forth in the unpublished opinion of the California Court of Appeal, Third District, No. C043093.[1] Petitioner is the defendant referred to therein.

> In August 2001, Abel Roque lived with his girlfriend, Marlo McKnight, in an apartment on San Joaquin Street in Stockton. Previously, McKnight had lived with her uncle, William Brown, in another apartment in the same complex. After McKnight moved in with Roque, defendant moved in with [Brown, who was his father.] Defendant is McKnight's first cousin.
>
> On the evening of Wednesday, August 22, 2001, Stockton police officers responded to Roque's apartment to investigate a report of a foul odor. A "do not disturb" sign was taped on the front door, which was locked. The porch light bulb had been unscrewed. Officers kicked in the door. Most of the lights in the apartment were turned off. In the bedroom, officers found Roque's body lying on top of the covers on a bed, next to an empty bottle of Southern Comfort. Beer cans were also in the bedroom. Roque's throat and face were cut. There were no signs of a struggle, burglary or robbery. Based on the blood smears, he had been killed while sleeping on his back. A fan, which was next to the bed, was on at the time of the killing. In the kitchen, officers found an ice chest and some more beer cans.
>
> An autopsy revealed that Roque had a seven-inch-long incised wound to his neck caused by an edged instrument such as a knife. The wound was potentially fatal. His left ear had been cut off. He also had a laceration and skull fracture caused by a blunt instrument such as a hammer. This wound was also potentially fatal. The cause of death was the loss of blood from the neck and ear wounds plus the blunt force trauma to his head. His blood-alcohol content was .28 percent. Roque died sometime between late Sunday, August 19, 2001, and early Tuesday, August 21, 2001. A criminalist observed no defensive wounds on Roque's body.
>
> Late Saturday, August 18, 2001, Roque and Tony Watkins, another resident of the complex, scuffled over a dent in Watkins' car which he claimed Roque caused. Roque was drunk. Watkins hit Roque and pushed him down the stairs. Victor Sheldon, another resident, attempted to break up the fight. McKnight claimed she and Roque left the apartment complex and went to Oakley, where her parents lived, because Watkins had threatened Roque. However, she had agreed to housesit a home located just around the corner from her

---

[1] Lodged in the record as document 2 (1/4/07).

parents' home.

On Sunday, August 19, 2001, Sheldon saw defendant at the apartment complex and explained that he needed his van, which he had loaned to Roque, on Monday to go to work. Defendant said he knew; he appeared to be in a hurry.

McKnight claimed that Roque and defendant were with her in Oakley on Sunday evening. Roque and defendant argued and McKnight told them to leave. Roque left in a Rambler and defendant followed in the van. They returned when there was a problem with the van. Roque and McKnight argued and McKnight told him to leave. Defendant and Roque left in the Rambler. McKnight claimed she never saw Roque again.

Paul Martin saw Roque at 2:40 a.m. on Monday, August 20, 2001. Martin was waiting on his balcony for his ride to work. Roque and defendant drove up in Roque's Rambler. Martin declined Roque's invitation to join them for a beer, but when Roque claimed they were "partying" all night, Martin said he would stop by at noon when he got off work. Roque told him to just knock on the door. Martin went by Roque's apartment at 12:30 p.m. and found a "do not disturb" sign on the door. Martin had never seen the sign before although another resident claimed to have seen it on Saturday, August 18 and McKnight claimed she and Roque put up the sign a couple of days before Roque's death. [Martin] noticed that Roque's Rambler and possibly the van were gone. Martin did not see McKnight on Monday, Tuesday or Wednesday.

On Monday, August 20, 2001, or Tuesday August 21, 2001, McKnight saw defendant wearing Roque's pants and Raiders jacket and carrying a backpack. According to McKnight, defendant explained that Roque had given him the clothes. McKnight denied telling a detective that defendant pulled some of Roque's belongings out of the backpack. McKnight asked defendant about Roque's whereabouts but defendant did not respond. McKnight's sister, Tammy, also saw defendant wearing a black leather jacket but did not recall whether there was a Raiders insignia on it. Defendant explained to Tammy that he and Roque had argued about Roque's drinking, that Roque's Rambler broke down and that a friend drove defendant to Oakley. According to Tammy, McKnight had a bruise under one eye and a mark under the other. Tammy knew that defendant and McKnight were close and defendant "was pissed off because [Roque] hits [ ] [McKnight] all the time." One time, Roque set McKnight's hair on fire. Defendant had told Tammy that Roque would "get his."

That Monday, McKnight called Sheldon and asked whether he knew the whereabouts of Roque. Sheldon had not seen Roque since Saturday evening. Sheldon had previously heard defendant threaten to kill Roque.

3

Wednesday afternoon, McKnight decided to go to Stockton. Defendant tried to persuade her not to return to the apartment and told her that Roque was dead. Defendant stated that he had "whacked" Roque. McKnight returned to Stockton with defendant and a friend of Tammy's. McKnight went to Sheldon's apartment asking if he knew the whereabouts of Roque, but telling Sheldon that Roque was dead. McKnight later denied telling Sheldon that Roque was dead. Sheldon wanted the keys to the van but McKnight refused. McKnight went to Richard and Irene Hembry's apartment and asked Richard to break into Roque's apartment. On previous occasions when McKnight was locked out of Roque's apartment, McKnight had borrowed a butter knife or other tools from the Hembrys to either pop the window open or to open the locked door. McKnight was concerned because Roque had never been away for so long; she told the Hembrys that he was dead. Richard Hembry went to Roque's apartment with his son, smelled a strong odor, and his son called 911.

McKnight left with Tammy's friend, defendant and William Brown. McKnight told Brown that defendant claimed to have killed Roque and asked if that was possible. Brown believed that defendant was not serious and when confronted, defendant denied it. Brown had to break up a fight between defendant and Roque a few days before Roque's body was found. Brown opined that defendant and McKnight appeared to have been on methamphetamine for a number of days. Brown returned to his apartment and defendant and McKnight went to Oakley to her parents' home. The next day, police searched both Oakley homes. They found a Raiders jacket and a backpack with several pieces of identification belonging to defendant in the home McKnight was house-sitting.

In August 2001, McKnight's father discovered a boot knife with a two and a half inch blade missing from his car. His discovery occurred shortly after defendant had been in the car.

(C043093 opinion at 1-3.)

## III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## IV. ANALYSIS OF THE CLAIMS

### A. Insufficient Evidence

Petitioner claims that the evidence adduced at trial was insufficient to support his first degree murder conviction.  Specifically, he contends that the evidence did not support the required element of premeditation.

On habeas corpus review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); s*ee also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  As stated by the United States Court of Appeals for the First Circuit, the focus under *Jackson* is not the correctness, but rather, the reasonableness of the state judgement. *See Hurtado v. Tucker*, 245 F.3d 7, 19 (1st Cir. 2001).  The dispositive question is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 318).

The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004) (*quoting Jackson*, 443 U.S. at 319.)  Under California law, "[a] verdict of murder

5

in the first degree... is proper only if the slayer killed 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, [ ] according to a preconceived design.'" *Davis*, 384 F.3d at 639 (*quoting People v. Caldwell*, 43 Cal.2d 864, 869 (1955)). There must be "more reflection than [ ] involved in the mere formation of a specific intent to kill." *Davis*, 384 F.3d at 639-40 (*quoting People v. Anderson*, 70 Cal.2d 15, 26 (1968)). The law recognizes, however, that the requisite deliberation or premeditation may be conceived within a short period of time. *Drayden v. White*, 232 F.3d 704, 710 (2000) (*citing People v. Perez*, 2 Cal.4th 1117, 1127 (1992); *see also People v. Mayfield*, 14 Cal.4th 668, 767 ("Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly").

Courts reviewing sufficiency of the evidence for a first degree murder conviction in California should look for evidence of (1) planning, (2) motive, and (3) the manner of killing. *See Davis*, 384 F.3d at 640. Evidence of just one or two of these factors is enough to sustain a conviction for first degree murder, if the evidence is strong. *See Id*.

In this case, the California Court of Appeal, Third District, held that sufficient evidence supported the jury's finding that petitioner committed first degree murder:

> Defendant had a motive. Roque frequently hit and injured McKnight, defendant's first cousin with whom he was close. Tammy claimed defendant was "pissed off" because Roque hit McKnight all the time. Tammy heard defendant state that Roque would "get his." McKnight and Roque argued on Sunday night and the next morning, McKnight had a bruise under one eye and a mark under the other. Sheldon also heard defendant threaten to kill Roque. The evidence supported an inference that defendant planned to hurt or kill Roque because of his treatment of McKnight, and when Roque hurt McKnight on Sunday night, defendant carried through with his plan.
>
> Premeditation and deliberation is also shown by the manner of killing. Roque's throat had been slashed, his ear had been cut off and he had a skull fracture from possibly a hammer. No defensive wounds were found on the body. Sufficient evidence supports defendant's conviction for first degree murder.

(C043093 opinion at 4.)

6

Where conflicting inferences may be drawn from the evidence, this court must assign the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). With this constraint, for the reasons identified by the state appellate court, there was evidence from which a reasonable jury could have inferred that petitioner had a motive to kill Roque and that the murder was preconceived. The jury could have reasonably inferred that petitioner killed Roque while he slept, as a result of reflection and calculated judgment, as opposed to a "rash impulse." *See People v. Davis*, 10 Cal.4th 463, 511 (1995). Given the evidence adduced at trial, petitioner cannot meet the extremely stringent *Jackson* standard for demonstrating insufficient evidence for his first degree murder conviction.

### B. Newly Discovered Evidence[2]

Petitioner alleges that his conviction should be set aside based on newly discovered evidence. In support of this claim, petitioner offers the affidavits of Kay McKnight and Jamie Hope. In her affidavit, Kay McKnight declares as follows:

> On Sunday, August 19, 2001, the defendant spent the night with Marlo at Danette's house around the corner. My husband, Keith, and my son, Raymond, both saw the van and the station wagon parked in front of Danette's at 1:30 a.m. early Monday morning.
>
> Marlo told me that she and the defendant were alone in the house. Marlo made the defendant a bed on the sofa and went upstairs to go to sleep. Marlo was afraid to be alone, so she had the defendant come upstairs and sleep with her. Marlo told me that she was embarrassed to tell the police at the time of questioning because they would think that she was having sex with a relative.

(CT at 461-61.) Jamie Hope's affidavit declares:

> Before the discovery of Abel Roque's body, I saw Marlo McKnight's ex-husband, Doug Grigsby, in the garage below the apartments at 915 N. San Joaquin Street. I cannot recall the exact date and time, but it was in the early a.m. when I had gone downstairs to go for a walk. I stopped at the end of the staircase

---

[2] Although petitioner titled this claim "sufficiency of evidence" in both his federal petition (see Amended Petition, third ground for relief) and his state petition (see lodged document 5, second ground for relief) the crux of the claim is that his conviction should be set aside based on newly discovered evidence.

7

> and looked into the garage beneath the apartments. I could see Grigsby removing bloody coveralls. The garage was well lit and the coveralls were gray, the kind that men work in. Grigsby had his back to me and did not see me.
>
> Grigsby was standing near one of his cars. I cannot describe the make or the color of the car but I recall seeing Grigsby drive the car before.
>
> I went back upstairs and did not tell anyone about what I saw until I told Michelle Olson in August of 2002.

(Ct at 466-67.)

Respondent asserts that this claim is procedurally barred. Before seeking federal habeas corpus relief, a state prisoner must fairly present all claims to the highest state court to provide that court with an opportunity to rule on the merits of the federal claims. *Picard v. Connor*, 404 U.S. 270, 278 (1971). If a petitioner procedurally defaults his federal claims in state court by operation of a state rule that is independent of federal law and adequate to support the judgment, federal habeas review of the claims is barred unless the prisoner can demonstrate either cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). A state ground is independent and adequate if the last state court to which the petitioner presented the claim "actually relied" on a state rule that was sufficient to justify the decision. *Valerio v. Crawford*, 306 F.3d 742, 773 (9th Cir. 2002), *cert denied*, 538 U.S. 994 (2003).

Petitioner raised this claim in his superior court habeas corpus petition.[3] The San Joaquin Superior Court denied the claim on the single ground that it "could have been raised on appeal and therefore is not cognizable on habeas corpus."[4] (SF083625 order at 2.[5]) The superior

---

[3] Lodged document 5 (6/29/05) (see ground two, titled "sufficiency of evidence").

[4] Petitioner became aware of the newly discovered evidence at issue in December of 2002, well before his opening brief on appeal was filed in June of 2003.

[5] Lodged document 6 (6/29/05).

8

court cited three California cases: *In re Harris*, 5 Cal.4th 813, 855 (1993); *In re Walker*, 10 Cal.3d 764 (1974); and *In re Dixon*, 41 Cal.2d 756 (1953). The California Court of Appeal, Third District, and the California Supreme Court both rejected the claim without written opinion.[6] It is presumed that the state appellate court and state supreme court denied the claim for the same reason as the superior court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground"). Thus, in denying petitioner's claim, the California Supreme court actually relied on the three cases cited by the superior court: *Dixon*, 41 Cal.2d 756; *Walker*, 10 Cal.3d 764; and *Harris*, 5 Cal.4th 813.

In *Dixon*, the California Supreme Court held that "habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie when the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." *Dixon*, 41 Cal.2d at 759; *see also Walker*, 10 Cal. 3d at 773, and *Harris*, 5 Cal.4th at 826. It must now be determined whether the rule set forth in *Dixon* and upheld in *Walker* and *Harris* rests upon an independent and adequate state ground.

In *In re Robbins*, the California Supreme Court explicitly held that it would no longer consider whether an error alleged in a state habeas corpus petition constituted a federal constitutional violation. 18 Cal.4th 770, 811-12 (1998). In other words, if the California Supreme Court finds a claim to be procedurally defaulted after *Robbins*, it has done so solely upon state law grounds. *Id*. Petitioner's habeas corpus petition was denied by the California Supreme Court on July 26, 2006, well after *Robbins* was decided. Accordingly, the California Supreme Court's denial of the petition was necessarily predicated only upon consideration of state law issues, rendering the ruling an independent procedural bar. *See*, *e.g.*, *Protsman v.*

---

[6] Lodged documents 8 and 10 (6/29/05).

*Pliler*, 318 F.Supp.2d 1004, 1006-08 (S.D. Cal. 2004) (finding *Dixon* rule to be independent when the default was applied subsequent to the *Robbins* decision).

Whether the procedural bar imposed was adequate in addition to being independent depends on whether it was "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th cir. 2004) (*quoting Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir. 1997) (additional citation omitted); *see also Johnson v. Mississippi*, 486 U.S. 578, 588-89 (1988). The Ninth Circuit has adopted a burden-shifting analysis to determine adequacy. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). Under this analysis, when the state pleads, as an affirmative defense, that a claim is procedurally barred, the burden shifts to the petitioner to challenge the adequacy of that bar by showing that it has been inconsistently applied. *Id*. Where the petitioner challenges the adequacy of the bar, the state retains the ultimate burden of proving adequacy. *Id*. In this case, however, petitioner failed to contest the adequacy of the procedural bar raised by respondent.[7]

Petitioner has failed to meet his burden and the asserted procedural bar will be found to be adequate, in addition to independent. *See generally King v. Lamarque*, 464 F.3d 963, 967 (9th Cir. 2006) ("*Bennett* requires the petitioner to 'place [the procedural default] defense in issue" to shift the burden back to the government"); *see also Protsman*, 318 F.Supp.2d at 1008-09 (finding the *Dixon* procedural bar at issue here to be adequate where the petitioner failed to contest it). Respondent has successfully asserted the affirmative defense and petitioner's newly discovered evidence claim is procedurally barred in this court.

/////

---

[7] On December 4, 2007, petitioner requested an extension of time to file a traverse. On January 17, 2008, this court issued an order requiring petitioner to file his traverse within 30 days. The time for complying with the court's order expired, and petitioner failed to file a traverse or otherwise respond to the court's order. On March 3, 2008, the court issued an order requiring petitioner to file a traverse and to show cause in writing why the court should not consider the matter submitted for decision. Again, the time for complying with the order expired with no action by petitioner. On March 6, 2009, the court ordered that the matter would be considered submitted for decision.

The claim is also without merit. "[T]he existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on habeas corpus." *Townsend v. Sain*, 372 U.S. 293, 317 (1963) (*overruled on other grounds* by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). Newly discovered evidence provides a basis for federal habeas corpus relief only where it bears on the constitutionality of the petitioner's conviction. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id*.; *see also Coley v. Gonzales*, 55 F.3d 1385, 1387 (9th Cir. 2005); *Cooper v. Woodford*, 358 F.3d 117, 1124 (9th Cir. 2004).

In any event, the alleged newly discovered consists merely of Kay McKnight's affidavit containing hearsay statements and Jamie Hope's affidavit declaring that she saw another person in the victim's garage removing bloody coveralls on an unknown date. Assuming, arguendo, that petitioner's claim of actual innocence could be maintained in this action, he cannot make the necessary showing for relief. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The new evidence set forth by petitioner, however, was not strong. (See Section C, supra.) In light of the other evidence adduced at trial, this standard cannot be met. Petitioner is not entitled to relief on the basis of newly discovered evidence.

        C.      Ineffective Assistance of Counsel

For his final claim, petitioner alleges that he received ineffective assistance of counsel. A showing of ineffective assistance of counsel has two components. First it must be shown that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After the acts or omissions that are alleged not to have been the result of reasonable professional judgment

are identified, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice may be found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

Petitioner first alleges that his attorney failed to interview and subpoena Kathleen McKnight and Jamie Hope to testify at trial, and also alleges that counsel failed to interview or investigate four potential suspects who may have had information regarding the murder. He also contends that his attorney failed to subpoena phone records that might have been relevant.

Counsel had a duty to undertake reasonable steps to investigate all avenues of defense. *United States v. Tucker*, 716 F.2d 576, 583 (9th Cir. 1983); *see also Rio v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002). Interviewing witnesses may be particularly important to the preparation of a defense. *Tucker*, 716 F.2d at 583. There is, however, no rule that defense counsel interview all prospective witnesses (*Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)), or "pursue every path until it bears fruit or until all conceivable hope withers." *Tucker*, 716 F.2d at 584. "The specific tasks required for adequate preparation of a defense turn on the particular facts and circumstances of each case." *Id*; *see also Ames v. Endell*, 856 F.2d 1441,

12

1445 (9th Cir. 1988) (duty to investigate determined by the facts known).

Contrary to petitioner's claim, the motion for a new trial filed by trial counsel stated that both Kathleen McKnight and Jamie Hope were interviewed by defense investigators prior to commencement of trial, but did not relay any information useful to the defense:

> Although both of them spoke to law enforcement and to defense investigators neither of them revealed the facts which they related when interviewed on December 3. Thus their evidence remained undiscovered and the defendant was unable to present their exculpatory statements at trial.

(CT at 464.) Petitioner has not shown that counsel's performance was deficient in relation to witnesses McKnight and Hope. A defense attorney's "duty of investigation is determined by the facts he knows." *Ames*, 856 F.2d at 1444. There is no evidence that defense counsel knew or should have known that McKnight or Hope had any information useful to the defense at trial. Accordingly, he had no duty to subpoena them for trial.

Moreover, no actual prejudice is shown. As the trial court concluded when ruling on the motion for a new trial, the additional testimony of McKnight and Hope would have been insignificant and would not have changed the outcome of the trial:

> [A]s to K. McKnight. I don't think that what she says is that significant. She last saw-- she last saw the vehicle at 1:30 in the morning. There was no exact time as to when this homicide occurred and she didn't-- she doesn't say whether she saw anything after 1:30. So it could very well be that sometime after 1:30 the defendant took one of those vehicles. Of course, it could also be that sometime before 1:30 the defendant took a different vehicle. It could be that the defendant took one of those vehicles before 1:30 and returned at 1:30. So that is not that significant, seeing the vehicle.
>
> As far as the statement that Marlo was with the defendant, there is no time frame. Marlo had the defendant come upstairs to sleep with her. What time did Marlo go to sleep? The defendant could have-- could very well have left after she went to sleep and returned before she woke up.
>
> The other issue is as to-- as to Jamie Hope. She saw-- saying she saw Doug Grigsby with bloody coveralls. Well, first of all, how much blood is on the coveralls? Were these the coveralls? So-- and even if they were the coveralls, that doesn't mean he did it. It

13

> makes it possible that he did it, or perhaps he's an accessory. But I don't think that that would-- either one of those would be significant.
>
> So I think the important issue is that even if that evidence were presented at a retrial, I don't think that it's probable that a different result would ensue. In fact, I don't think it's likely that there would be a different result. I don't think those are significant facts.

(RT at 665-666.)

With regard to the four potential suspects whom petitioner claims counsel failed to sufficiently investigate, petitioner states that they "had some kind of motive to point the finger at him," and suggests that one of them may have been the true killer. These men are Doug Grigsby, Victor Sheldon, Tony Watkins, and Paul Martin. Petitioner's assertion that they should be considered suspects because they might have had some kind of motive to frame him is vague and conclusory. He claims that an investigation of these men might have uncovered information helpful to the defense but sets forth no specific evidence or allegations of what might have been uncovered. Relief is not warranted on such a claim. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (conclusory allegations that counsel provided ineffective assistance "fall far short of stating a valid constitutional violation") (*citing James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th cir. 1970) ("[a]llegations of fact, rather than conclusions, are required").

In any event, petitioner has not met either prong of the *Strickland* standard. Once again, a defense attorney's "duty of investigation is determined by the facts he knows." *Ames*, 856 F.2d at 1444. The alleged suspects were interviewed and investigated by the police and the information obtained fully considered by defense counsel; there is no evidence that counsel knew or should have known of any reason to conduct further investigation regarding any of these men. Petitioner has not shown that counsel's performance was deficient. *See generally, Bowling v. Parker*, 344 F.3d 487, 504 (6th Cir. 2003) (counsel was not ineffective in failing to investigate a possible third-party suspect because the evidence was farfetched and the petitioner did not

explain why the third-party had any interest in framing him for the murder).  Counsel fulfilled his duty to point out the areas of possible doubt in the prosecution's case in this regard when he presented others as possible suspects in closing arguments, pointing to their possible motivations based on the evidence adduced:

> [Petitioner is] not the only one [who] had opportunity, who had access to Mr. Roque on Monday.
>
> The first guy, Victor Sheldon.  He lived in the apartment building. [ ] I think to a reasonable person Mr. Sheldon is trying to have-- has something to hide.  He clearly told you that Abel got a hold of his van by some kind of financial dealing, and that he still owes him money or still owed him money.  By hood or by crook, Abel had got possession of his van and converted, transferred it into his own name.
>
> He claims to be Abel's best-- best friend.  In fact, everybody now is claiming to be Abel's best friend.  But from what we've heard [ ], he seems to-- he's always getting in a fight with somebody.  Practically everybody that testified about this-- Victor didn't actually admit, maybe he was never asked, but most of them got in physical fights with him.
>
> Which brings up Tony Watkins.  He lived in the apartment building, too.  During-- he said he leaves in the fairly early in morning hours, but way after 3:00 o'clock, to go to his AA meeting.  All day, I guess.
>
> He fought with Abel and he beat him up a couple days ago and threatened to slit William Brown's throat from ear to ear.  And then after that when the-- when Abel, Marlo took off, [ ] perhaps, he came back and threatened Victor Sheldon with his brother, to the point where Victor thought he had to get a kitchen knife to possibly defend himself from-- from Mr. Watkins.  But now Mr. Watkins is totally happy and it's all over with and no problem.
>
> And then there's Doug Grigsby, used to live in the apartment building.  Didn't like Abel.  His ex-- Marlo was his ex-girlfriend, or who knows, because he certainly maintained contact with her.  Several witnesses said he would come over there when Abel was gone.
>
> And then there's some guy walking down the street.  If Victor Eggros hadn't testified about this, you know, you wouldn't-- you really don't get the flavor of what's going on over there.  He went to jail because he's the apartment manager and people would come over there and get in physical confrontations.  He was directly asked about this.  It wasn't just noisy, it wasn't just making

> arguments, he's talking about people getting in physical-- physical fights and he had to physically kick them off the property. And one time he overdid it and ended up in jail.
>
> If I-- the places that average people live, average jurors live, you don't have those kind of problems. So, if I said, "Well, geez. Somebody could just be walking along, could be your enemy, march right into your home, and since you leave the door open, attack you." You'd say, "That's ridiculous." I hope it's ridiculous for you jurors. I hope.
>
> But it's not ridiculous for the people that live there , as you could-- when you look at the evidence that's-- that's in front of you and the fights, spats, and carrying on that was going on in those apartments.
>
> So if Abel, who has no enemies whatsoever, according to everybody he was the nicest guy in the world, except it seemed like he was always getting in fights. There's other people out there, too.

(RT at 591-93.) Petitioner has failed to show that counsel's performance was deficient, and moreover, based on the lack of exculpatory evidence, there is no reasonable probability that the result of the proceeding would have been different had counsel conducted further investigation of the case. Petitioner is not entitled to relief on his claim that trial counsel rendered ineffective assistance.

## V. CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

/////

that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 24, 2009.

*/s/ Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE